# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7685 | **DATE** | March 15, 2004 |
| **CASE TITLE** | Charles E. Anderson v. Donna M. DePhillips | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for summary judgment [12-1] is denied. This case is set for a status conference on March 31, 2004, at 11:00 a.m. at which time the court will set dates both for discovery cut–off and for trial. ENTER MEMORANDUM OPINION.

(11) [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| x | Notices MAILED by judge's staff. | | MAR 17 2004 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | | | |
| | Copy to _____ | | | date mailed notice | |
| KAM | courtroom deputy's initials | U.S. DISTRICT COURT CLERK | Date/time received in central Clerk's Office | KAM | mailing deputy initials |

(Reserved for use by the Court)

02-7685.041-TCM                                    March 15, 2004

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHARLES E. ANDERSON, Trustee on      )
behalf of BOARD OF TRUSTEES OF THE   )
PAINTERS' DISTRICT COUNCIL NO. 30    )
HEALTH AND WELFARE FUND,             )
                                     )
             Plaintiff,              )      No. 02 C 7685
                                     )
        v.                           )
                                     )
DONNA M. DePHILLIPS,                 )
                                     )
             Defendant.              )

DOCKETED
MAR 1 7 2004

### MEMORANDUM OPINION

Before the court is defendant's motion for summary judgment.
For the reasons set forth below, the motion is denied.

### BACKGROUND

Plaintiff Charles Anderson is a Trustee of the Painters'
District Council No. 30 Health and Welfare Fund ("the Fund").  The
Fund is a trust that pays out medical, disability, and death
benefits to member employees (and their covered dependents and
beneficiaries) in accordance with the Painters' District Council
No. 30 Health and Welfare Plan.  The Fund is a multi-employer
benefits plan subject to the Employee Retirement Income Security
Act of 1974, 29 U.S.C. §§ 1001, et seq. ("ERISA" or "the Act").
Defendant DePhillips is a former employee of the Fund.   This
action, brought by Anderson in his capacity as Trustee, alleges
that DePhillips breached her fiduciary duties under ERISA, and

seeks to recover financial losses to the Fund allegedly caused by the breach.

The following facts are drawn from the parties' Local Rule 56.1 Statements and are undisputed unless otherwise noted. In November 1993, the Fund's Board of Trustees ("the Board") hired DePhillips to supervise the Fund's office staff and to handle various administrative matters relating to the Fund. She reported directly and solely to the Board, an eight-member panel which met quarterly to discuss Fund business.

DePhillips was never given a written job description. She testified at her deposition that, when hired, she understood that her responsibilities generally would be "managing the office, overseeing one claims adjustor, one clerical person and a bookkeeper, answering to the trustees regarding any business that came up." (Def's Exhibits to 56.1 Statement, Ex. D (DePhillips Dep., p. 11).) Anderson also testified to DePhillips's duties:

> She was hired as the Fund Administrator to interpret the plan of benefits, to enter into contractual obligations with vendors, to deal with our professionals and our consultants, our actuaries, our auditors, legal counsel [.] She was in charge of the office. She was in charge of any special projects that came to light through changes in Health and Welfare and/or Pension. She had the ability to hire and fire and to fully administer the Funds.

(Pl.'s 56. 1 Statement, ¶ 15, Ex. M (Anderson Dep., pp. 13-14).) DePhillips denies the last sentence of the quoted testimony, that

"[s]he had the ability to hire and fire and to fully administer the Funds." She also denies that she was hired as the "Fund Administrator," and claims instead that she was the Fund's "Administrative Manager." DePhillips does not contest the remainder of Anderson's summary.

In addition to the parties' deposition testimony, DePhillips proffers a two-plus page interrogatory answer which lists her general job functions in the following areas: office management, Fund maintenance, claims adjustor supervision, employer audits, preparation of reports for employer delinquency meetings and Board meetings, bookkeeping, and dealing with consultants and vendors.

With these summaries as background, we focus on several areas of DePhillips's responsibilities that are particularly relevant to our analysis below. First, DePhillips had significant authority over "claims handling, adjudication, monitoring, recordkeeping, payment and reimbursement." (Pl.'s 56.1 Statement, ¶ 20.) With respect to claims processing, although DePhillips had initial authority to grant or deny claims, appeals were decided by the Board.

Second, DePhillips trained and oversaw the Fund claims adjustors. She trained them on "not just how to use the system but how to adjust claims, how to look at the plan and apply those – what the plan rules [sic] or how to apply it to a claim." (Pl.'s 56. 1 Statement, ¶ 28, Ex. D (DePhillips Dep., pp. 84-85).)

DePhillips would decide when adjustors were competent to process claims without her help, and she would assist in processing claims when there was a backlog.

Finally, and at the heart of this dispute, DePhillips was responsible for monitoring and maintaining various Fund contracts. One such contract was the Group Medical Specific Excess Risk Agreement which the Fund maintained with Bankers Life and Casualty Company ("the Stop-Loss Policy" or "the Policy"). By the Policy's terms, Bankers Life agreed, *inter alia*, to reimburse the Fund for certain medical expenses in excess of $150,000 incurred by a Fund participant in one calendar year ("the Stop-Loss threshold") and paid by the Fund by the end of the next calendar year ("the Agreement Period"). Under the Policy, the Fund was required to provide notice to Bankers Life of any Stop-Loss claims within ninety days of the end of the Agreement Period.

In 1996, three Fund participants incurred covered medical expenses exceeding $150,000 which were paid by the Fund on or before December 31, 1997: $213,107.84 for James Flynn, $34,063.23 for Maria DeJesus, and $146,418.23 for Christine Angelos. In 1997, two Fund participants incurred covered medical expenses, again exceeding $150,000, and paid by the Fund on or before December 31, 1998: $112,234.42 for Jeffrey Holzkampf, and $232,846.61 for Delton Robbins.

The Fund never submitted Stop-Loss claims to Bankers Life

for any of these individuals. The parties agree that the unsubmitted claims totaled $732,293.70.[1] It is undisputed that DePhillips was responsible for submitting the Stop-Loss claims, but, in an interrogatory response, she maintains that she was never given the requisite information from the claims adjustors to do so:

> [I]t was the responsibility of the claims adjusters employed by the Fund to notify DePhillips once a Stop-Loss threshold was reached by an individual member. As claims were paid, the claims adjusters were able to review the aggregate amount of money paid out towards the patient's life-time maximum on the computer screen. Once the Stop-Loss limit was reached, paper copies of that individual's claims should have been pulled from the "claims batches", a copy of that patient's Explanation of Benefits letter for each claim should have been printed, and all of those documents should have been photocopied for submission to Banker's Life, along with a Banker's Life claims form. Copies of all photocopied information and the completed claim form should have been provided by the claims adjusters to DePhillips for follow-up.

(Def's. 56.1 Statement, ¶ 10, Ex. C (DePhillips Interrogatory Answer No. 11).)

DePhillips testified at her deposition that she could not recall any procedures used by the adjustors to monitor for potential Stop-Loss claims. She further testified that she did not

---

[1] By our count, the five unsubmitted claims total $738,670.33, not the alleged (and perhaps not surprisingly, admitted) lesser amount of $732,293.70.

remember ever having any conversations with any adjustors regarding the Stop-Loss Policy.

Lastly with respect to the Policy, Anderson presents the minutes of a June 12, 1996 Board meeting, taken by DePhillips herself, which reflect that she was explicitly told by the Fund's attorney to notify Bankers Life, in anticipation of a potential Stop-Loss claim, that a Fund member's wife had recently given birth to quadruplets.

DePhillips was terminated by the Board in October 1999. Anderson's testified that she was fired because of "problems with the members, problems with the employees, timeliness of projects, not being completed," and "[t]he inability for her to provide information to the Trustees." (See Def's 56.1 Statement, Ex. M (Anderson Dep., p. 23).) The record gives no indication that her termination was related to events giving rise to this suit.

In Spring 2000, Milan Diklich, DePhillips's successor, discovered that the Fund had failed to submit to Bankers Life the five Stop-Loss claims that had accrued in 1997 and 1998. Diklich submitted the claims, but they were denied for failure to provide timely notice as required under the Policy.

On October 28, 2002, Anderson, in his capacity as Trustee of the Fund, filed this one-count complaint against DePhillips alleging that she breached her fiduciary duty under ERISA by "fail[ing] to monitor the amounts of medical claims of Fund

members, fail[ing] to keep adequate records to identify payments exceeding the Stop-Loss threshold, and fail[ing] to file any available stop-loss claims with Bankers Life. . . ." (Compl., pp. 4-5.)  DePhillips has moved for summary judgment.

## DISCUSSION

Summary judgment will be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In considering a summary judgment motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the non-moving party.  See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999).

The moving party has the burden of demonstrating the absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  If the moving party meets this burden, the non-moving party must set forth specific facts that demonstrate the existence of a genuine issue for trial.  Id. at 324.  The non-movant may not rest on pleadings alone, but must "come forward with evidence that would reasonably permit the finder of fact to find in [the non-movant's] favor on a material question."  McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).  In sum, the court must determine "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Anderson's complaint raises a single legal theory, breach of fiduciary duty under ERISA.[2] The Act imposes a prudent person standard of care upon any person or entity acting as a fiduciary of an ERISA benefit plan. <u>See</u> 29 U.S.C. § 1104(a)(1)(B). A ERISA breach of fiduciary duty claim, like its common-law counterpart, has two liability components: a duty and a breach. And DePhillips, by her motion, contends that there is no triable issue on either one. She argues, first, that she is not an ERISA fiduciary and therefore not subject to its fiduciary duties, and second, even if she were, she did not breach any of those duties. We address these arguments in turn.

---

[2]There is no dispute that the Fund is an "employee welfare benefit plan" under ERISA. The statute defines an employee welfare benefit plan as:

> [A]ny plan, fund, or program which
> . . . is . . . established or
> maintained by an employer or by an
> employee organization . . . for the
> purpose of providing for its
> participants or their beneficiaries,
> through the purchase of insurance or
> otherwise, (A) medical, surgical, or
> hospital care or benefits, or benefits
> in the event of sickness, accident,
> disability, death or unemployment. . . .

29 U.S.C. § 1002(1).

## A.     ERISA Fiduciary

DePhillips is right that an ERISA breach of fiduciary duty claim will lie against her only if she qualifies as an ERISA "fiduciary." Our starting point is the statute. Section 3(21)(A) of ERISA provides:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). A Department of Labor ("DOL") guideline amplifies ERISA's definition:

> A person who performs purely ministerial functions . . . for an employee benefits plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary. . . .

29 C.F.R. § 2509.75-8 D-2. Thus, "to be a fiduciary, the individual or entity involved must exercise a degree of discretion over the management of the plan or its assets, or over the administration of the plan itself." Schmidt v. Sheet Metal Workers' Nat'l Pension Fund, 128 F.3d 541, 547 (7th Cir. 1997); see also Pohl v. Nat'l Benefits Consultants, Inc., 956 F.2d 126, 129

(7th Cir. 1992) ("ERISA makes the existence of discretion a sine qua non of fiduciary duty.") (<u>citing</u> 29 U.S.C. § 1002(21)(A)). The Seventh Circuit has also made clear, consistent with the Act's remedial purpose, that the term "fiduciary" is accorded a liberal interpretation. <u>See, e.g.</u>, <u>Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.</u>, 713 F.2d 254, 260 (7th Cir. 1983) ("It is clear that Congress intended the definition of fiduciary under ERISA to be broad.").

Finally, and important here, section 3(21)(A)'s qualifying language "to the extent" means that a person may be a fiduciary for some purposes and not others. <u>See</u> 29 U.S.C. § 1002(21)(A); <u>Plumb v. Fluid Pump Service, Inc.</u>, 124 F.3d 849, 854 (7th Cir. 1997); <u>see also</u> <u>Am. Fed'n of Unions Local 102 v. Equitable Life Assurance Soc'y of the United States</u>, 841 F.2d 658, 662 (5th Cir. 1988) ("A person is a fiduciary only with respect to those portions of a plan over which he exercises discretionary authority or control."). In other words, whether an individual or entity is an ERISA fiduciary is not an "all or nothing" proposition.

Therefore, in assessing whether an individual is liable for breach of fiduciary duty, "a court must ask whether [that] person is a fiduciary with respect to the particular activity at issue." <u>Plumb</u>, 124 F.3d at 854 (<u>quoting</u> <u>Coleman v. Nationwide Life Ins. Co.</u>, 969 F.2d 54, 61 (4th Cir. 1992)). Here, because the complaint's allegations are limited to DePhillips's conduct in

relation to the Stop-Loss Policy, the dispositive question is whether DePhillips exercised sufficient discretionary authority with respect to that Policy to qualify as a fiduciary.[3]

With these principles in mind, we proceed to the merits of DePhillips's motion. Parroting the DOL regulation, she contends that she "merely performed ministerial services, within the framework of policies, interpretations, rules, practices and procedures made by the Fund's Board of Trustees, without exercising any discretionary control . . . ." (Def.'s Mot., p. 12.) Her lack of discretionary authority is *conclusively* established, she argues, by two plan documents. The first is the governing plan agreement, titled "Restatement Agreement and Declaration of Trust of the Painters' District Council No. 30 Health and Welfare Fund ("the Agreement"), which provides in relevant part:

> Section 7. The Trustees are empowered to allocate fiduciary responsibilities among the Trustees and to designate persons other than Trustees to carry out fiduciary responsibilities as provided in this Restated Agreement. The power to allocate fiduciary responsibility shall not apply to the application of the responsibility to manage the assets of the Plan other than the power to appoint an investment manager or managers.
>
> The Trustees shall have exclusive authority

---

[3]That is not to say that evidence that DePhillips did or did not act in a fiduciary capacity in other areas is irrelevant. Quite the contrary, a showing that she had fiduciary authority over other functions may make it more probable that she was a fiduciary for the Stop-Loss Policy, and vice versa.

> to manage and control the assets of the
> Trust except to the extent that such
> authority to manage, acquire, or dispose of
> the assets of the Plan is designated to one
> or more investment managers in accordance
> with the following paragraph.
>
> The Trustees are hereby empowered to appoint
> an investment manager or managers to manage,
> acquire or dispose of any assets of the Fund.
> An "investment manager" is any fiduciary
> who has been designated by the Trustees to
> manage, acquire or dispose of any assets of
> the Fund, who is registered as an investment
> adviser under the Investment Advisors Act of
> 1940, is a bank as defined in the Act, or is
> an insurance company qualified to perform
> services under the laws of more than one
> state, and who has acknowledged in writing
> that it is a fiduciary with respect to the
> Fund.

(See Def's. 56. 1 Statement, Ex.E ("the Agreement").) DePhillips

interprets this section as unequivocally stating that *only* the

Trustees and an appointed investment manager can be fiduciaries of

the Fund. The provision is not as simple as DePhillips suggests.

It is clear on a few things: that the Trustees are fiduciaries;

that the Trustees may delegate fiduciary responsibilities to

others; and that *with respect to asset management*, the Trustees may

only delegate fiduciary responsibility to a defined "investment

manager."

The provision is less clear on other matters.

Specifically, does the first sentence's qualifying language "as

provided in this Restated Agreement" refer to "[t]he Trustees are

empowered to allocate fiduciary responsibilities" or does it modify

"fiduciary responsibilities"? If it is the former, then as DePhillips urges, the provision would appear to limit delegations of fiduciary responsibility to asset management, and then, only to investment managers. If it is the latter, then the provision seems only to circumscribe the limits of fiduciary grants as far asset management is concerned, leaving grants in other areas, *e.g.*, plan administration, within the Trustees' discretion. See 29 U.S.C. § 1002(21)(A)(i) and (iii) (Fiduciary status will attach if an individual has "any discretionary authority or discretionary control respecting *management* of such plan" or "any discretionary authority or discretionary responsibility in the *administration* of such plan.") (emphasis added).

In the end, we need not resolve the ambiguity, at least within the four corners of the Agreement. While plan documents are a good starting point in evaluating an individual's fiduciary status, they are not, as DePhillips would have it, the final word on the matter. We must also look at the evidence of her actual conduct to determine whether, on the one hand, she had discretionary authority in her responsibilities or, on the other, simply performed ministerial functions within a framework of procedures established by the Board. So even if the Agreement could be interpreted to prohibit the delegation of fiduciary responsibilities to anyone other than Trustees and "investment managers," if DePhillips nonetheless *did* perform functions in

relation to the Stop-Loss Policy that were discretionary within the meaning of section 3(21)(A), then she is a fiduciary. See, e.g., Associates in Adolescent Psychiatry v. Home Life Ins. Co., 941 F.2d 561, 568 (7th Cir. 1991) (A "fiduciary" need not be expressly named as such in the plan documents, but need only fall within ERISA's definition of the term.); Harold Ives Trucking Co. v. Spradley & Coker, Inc., 178 F.3d 523, 526 (8th Cir. 1999) (Plan documents are controlling only to the extent that they are consistent with the actual allocation of duties.).

DePhillips also refers us to a 2000 plan description, titled Painters' District Council No. 30 Health and Welfare Plan Summary Plan Description, 2000 Edition ("the SPD"), which provides:

> [A] Board of Trustees is responsible
> for the operation of this Plan.  Although
> the Trustees are legally designated as
> the Plan Administrator, they have
> delegated certain administrative
> responsibilities to an Administrative
> Manager.  The Administrative Manager is
> responsible for maintaining eligibility
> records, accounts for employer
> contributions, answering participant
> inquiries, processing claims and benefit
> payments *and handling other routine
> administrative functions.*

(Def's. 56. 1 Statement, ¶ 14, Ex. F (the "SPD").) (emphasis added.)  DePhillips reads the SPD as stating that the Administrative Manager is responsible *only* for routine administrative functions.  She acknowledges that the SPD was drafted after she was terminated, but nonetheless argues that

because she had the same job responsibilities as the Fund's Administrative Manager in 2000, Milan Diklich, the SPD language applies equally to her. Again, and wholly apart from the relevancy problem posed by its date, the SPD can help DePhillips only if she can show that she *in fact* handled only "routine administrative functions."[4]

It is clear, contrary to DePhillips's apparent understanding, that plan documents, while of course relevant to her fiduciary status, cannot alone establish that she was not a fiduciary.[5] The bigger problem for DePhillips, however, is that when we look behind the plan documents to the record on her *actual*

---

[4]DePhillips also makes much of the "fact" (it is disputed) that she was not a "Fund Administrator" as Anderson contends, but rather an "Administrative Manager." Even if she were hired as an "Administrative Manager," we find little in the distinction. Indeed, "whether an individual or entity is an ERISA fiduciary must be determined by focusing on the function performed, rather than on the title held." Boucher v. Williams, 13 F.Supp.2d 84, 91 (D. Maine 1998). To hold otherwise would elevate form over substance and "enable trustees to transfer important responsibilities to a largely immunized 'administrative entity.'" Eaton v. D'Amato, 581 F.Supp. 743, 746 (D.D.C. 1980). The rejection of the tyranny of labels is traditionally attributed to Abraham Lincoln: "If you call a tail a leg, how many legs has a dog? Five? No, calling a tail a leg don't *make* it a leg."

[5]This cuts both ways. Anderson offers in rebuttal various documents which indicate that DePhillips was a named fiduciary under the Fund's fiduciary liability insurance policies in 1997 and 1998, and was the only individual besides the Trustees so designated. DePhillips herself completed, signed and submitted the policy application which designated her a Fund fiduciary. (See Pl.'s 56.1 Statement, ¶¶ 32-34, Ex. D.) Like DePhillips' plan documents, these documents are unmistakably relevant to her fiduciary status, but under the same rationale articulated above, they are not decisive.

job functions, she offers little evidence to support her contention that her role was "merely ministerial," particularly with respect to the Stop-Loss Policy. First, she points to her interrogatory answer which lists her general job functions, and maintains that from that list "it is clear" that she was not a fiduciary. The list may be helpful in determining *which* duties DePhillips was charged with generally, but it does not reveal the extent of her discretion in carrying out those duties. What is more, the list does not even *mention* the Stop-Loss Policy.

Next, DePhillips maintains, and it not contested, that the Board, not she, decided whether to grant or deny claims appeals. The mere fact, however, that the Board had final say on appeals does nothing to foreclose DePhillips's potential fiduciary authority over the Stop-Loss Policy, or even claim processing for that matter. See Am. Fed'n of Unions Local 102, 841 F.2d at 663 ("[Appellant's] fiduciary status was not diminished by the trustees' final authority to grant or deny claims and approve investments. The term fiduciary includes those to whom some discretionary authority has been delegated.") (citing H.R.Conf. Rep. No. 1280, 93rd Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 5038, 5103).

DePhillips has thus presented in support of her motion a smattering of evidence - plan documents, personnel titles, a boilerplate list of functions, and marginally relevant evidence

regarding claims appeals – none of which establishes the scope of DePhillips's actual functions or authority in relation to the Stop-Loss Policy, and certainly not conclusively so.

Indeed, when we examine Anderson's rebuttal evidence, it appears that *both* parties have cast their discovery nets broadly, seemingly in an effort to establish that DePhillips was or was not a fiduciary generally, and not focusing on whether she was or was not a fiduciary over the Stop-Loss Policy. We re-emphasize, then, that our inquiry is not a general one, but focuses on "whether [the] person is a fiduciary *with respect to the particular activity at issue.*" Plumb, 124 F.3d at 854 (emphasis added).

The complete record with respect to the Policy reveals only the following: DePhillips was responsible for submitting the Stop-Loss claims to Bankers Life; she supervised the claims adjustors who monitored for potential Stop-Loss claims; and finally, she processed the billing for the premiums on the Policy. (See Def.'s 56.1 Statement, ¶ 10; Pl's 56.1 Statement, ¶¶ 28, 29, 41.) These isolated facts, without more, do not tell us whether DePhillips was a fiduciary. Is this an exhaustive list of her functions in relation to the Policy? Moreover, did the Board give her broad decision-making authority to manage the contract and ensure compliance with its terms as she saw fit? See, e.g., Eaton, 581 F.Supp. at 747 (Entity was a fiduciary when it made critical decisions regarding plan management, supervised the record-keeping

systems, possessed broad latitude in setting priorities and helped shape the agenda at board meetings.); <u>Russo v. B&B Catering, Inc.</u>, 209 F.Supp.2d 857, 862 (N.D.Ill. 2002) (Although collecting premiums from employees and transferring those funds to an insurer normally would be considered a "ministerial" function, because defendant had control over the process and had exercised discretion in how to earmark the funds, she was a fiduciary for that limited purpose). *Or*, did DePhillips have a more mechanical function, performing her duties in relation to the Policy under close Board supervision, or perhaps within a set of policies and procedures set by the Board (and if so, what were those policies and procedures)? <u>See, e.g.</u>, <u>Schmidt</u>, 128 F.3d at 544 n. 1, 547 (Fund employee whose duties included applying pension rules, determining amounts due under the plan, and responding to participants' inquiries regarding benefits, but with "no discretionary authority or control in the tasks she was assigned" was not a fiduciary.); <u>Beddall v. State Street Bank and Trust Co.</u>, 137 F.3d 12, 18 (1st Cir. 1998)("[T]he mere exercise of *physical* control or the performance of administrative tasks generally is insufficient to confer fiduciary status.") (emphasis added); <u>Landry v. Air Line Pilots Ass'n Int'l.</u>, 901 F.2d 404, 420 (5th Cir. 1990) (If entity's actual authority over a particular plan function was "subordinated to and dependent upon decisions" by others, then entity was not a fiduciary for that function.). Posing these questions another way, while DePhillips

surely did not have discretion on *whether* to get the job done, what was the extent of her latitude on *how* to get it done?

The present record leaves these questions unanswered, and therefore does not provide the court with an adequate basis on which to rule on DePhillips's fiduciary status as a matter of law. Accordingly, summary judgment (for either party) would be improper.[6]  See Sawyer v. United States, 831 F.2d 755, 760 (7th Cir. 1987) ("[B]ecause the evidentiary record was incomplete and genuine issues of material fact could exist . . . summary judgment is inappropriate.").

## B.  Breach of Fiduciary Duties Under ERISA

Although DePhillips has failed to show that, as a matter of law, she was not a fiduciary, she would still be entitled to

---

[6]The court recognizes that the paucity of record evidence from Anderson is due, *in part*, to DePhillips's vague deposition responses.  The following exchange is typical of the majority of her testimony:

> Q.  [D]o you recall, at the time that you were employed with Painters, were you aware of what the stop-loss threshold was on this policy?
>
> A.  I don't remember.
>
> Q.  You don't remember if you were aware of it?
>
> A.  Right.  I don't remember.  I mean, I don't remember – I cannot say yes or no to that question because I do not remember if I knew what that amount was.

(Def.'s 56.1 Statement, Ex. D (DePhillips Dep., p. 116).)

summary judgment if she can conclusively demonstrate that she did
not breach any fiduciary duties. ERISA requires that a fiduciary
carry out its responsibilities "with the care, skill, prudence, and
diligence under the circumstances then prevailing that a prudent
man acting in a like capacity and familiar with such matters would
use in the conduct of an enterprise of like character and with like
aims." 29 U.S.C. § 1104(a)(1)(B).[7]

The complaint alleges that DePhillips breached this duty by
"fail[ing] to monitor the amounts of medical claims of Fund
members, fail[ing] to keep adequate records to identify payments
exceeding the Stop-Loss threshold, and fail[ing] to file any
available stop-loss claims with Bankers Life. . . ." (Compl., pp.

---

[7]A fiduciary who breaches these duties is subject to
liability under 29 U.S.C. § 1109, which, in turn, can support a
claim under 29 U.S.C. § 1132(a)(2). Section 1109 provides, in
pertinent part:

> Any person who is a fiduciary with
> respect to a plan who breaches any
> of the responsibilities, obligations,
> or duties imposed upon fiduciaries by
> this subchapter shall be personally
> liable to make good to such plan any
> losses to the plan resulting from
> each such breach. . . .

29 U.S.C. § 1109(a). And section 1132 reads, in part:

> A civil action may be brought —
> (2) by the Secretary, or by a
> participant, beneficiary or fiduciary
> for appropriate relief under section
> 1109 of this title; . . .

4-5.)

DePhillips argues that, even if a fiduciary, she did not breach her fiduciary obligations to the Fund because she was never notified by a claims adjustor that the participants in question had exceeded the Stop-Loss Policy's $150,000 threshold. She explains: "Once the Stop-Loss limit was reached, paper copies of that individual's claims should have been pulled from the 'claims batches,' a copy of that patient's Explanation of Benefits letter for each claim should have been printed, and all of those documents should have been photocopied for submission to Banker's Life, along with a Banker's Life claims form. Copies of all photocopied information and the completed claim form should have been provided by the claims adjusters to DePhillips for follow-up." (Def's. 56.1 Statement, ¶ 10.)

DePhillips's argument must fail. Even if the claims adjustors did drop the ball, the evidence is in genuine dispute on the extent of DePhillips's supervisory authority over the adjustors in relation to the Policy. If DePhillips had a fiduciary obligation to ensure that the adjustors were reporting the Stop-Loss claims, as Anderson alleges, then a reasonable person might find that her action, or inaction, violated ERISA's prudent-man standard of care.[8] These are questions of fact, however, and on

---

[8]Further, if DePhillips is a fiduciary, although she may rely "on information, data, statistics or analyses furnished by persons performing ministerial functions for the plan" (29 C.F.R.

summary judgment, we do not try issues of fact, but only determine whether there are issues to be tried. See, e.g., Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir. 1994) (Whether ERISA fiduciaries acted "prudently" involves a question of fact precluding summary judgment.) Because the issue of whether DePhillips breached her fiduciary obligations involves disputed questions of fact, summary judgment is denied.

## CONCLUSION

For the foregoing reasons, DePhillips's motion for summary judgment is denied in its entirety.

DATE:   March 15, 2004

ENTER:  _____

John F. Grady, United States District Judge

---

§ 2509.758, FR-11), she may breach her fiduciary duties under ERISA by "failing to exercise care in training someone . . . or retaining [that person] in circumstances where they should know [that person's] performance to be inadequate." Schmidt, 128 F.3d at 547-48.